## CONTINENTAL CASUALTY CO. v. HANO et al.

### SAME v. DAVIS.
### Nos. 4661, 4672.

Circuit Court of Appeals, Third Circuit.
March 17, 1932.

H. Rook Goshorn, of Philadelphia, Pa., for appellant.

Alexander Conn, of Philadelphia, Pa., for appellees Hano and others.

Horace M. Schell and Frank Rogers Donahue, both of Philadelphia, Pa., for appellee Davis.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

DAVIS, Circuit Judge.

These are appeals from judgments entered in favor of Gilbert C. Davis and Richard Hano et al. against the Continental Casualty Company on a bond on which it became surety to indemnify Richard Hano et al. against loss sustained:

"(a) Through any dishonest act of any of the employees, wherever committed, and whether committed directly or by collusion with others.

"(b) Through any loss as a result of any loan made by the Insured or by any of the employees, whether authorized or unauthorized, if such loan was made with the intent on the part of such employees to defraud the Insured, (or, through)

"(c) Any loss sustained through trades fraudulently conducted by an employee in the name of a genuine customer."

Richard Hano et al. were brokers, and had in their employ one Edward K. Garrett, Jr., who, as chief margin clerk, kept the records of all the margin accounts. It was his duty to call the attention of his employers to any account whose margin was below the required amount and to notify the customer to furnish more collateral.

Gilbert C. Davis was a customer of the plaintiffs. Garrett gave quotations to him on stock and took from him orders to buy and sell. In September, 1929, Davis placed with him an order for the purchase of the stock of Horn & Hardart Company, gave him a "tip" that the stock was going up, and told "him to get in on it if he wanted to make

some money." Garrett told Davis that he did not have any money, and besides it was against the rules of the Stock Exchange and the brokerage firm by which he was employed to trade in his own name. Thereupon Davis said, "Buy 100 shares in my account and get out on Monday." This he did, and made a profit of $159.46. A check was drawn to the order of Davis by the brokerage firm, which, however, did not know what had taken place between Davis and Garrett. This was the first and only transaction put through the regular account of Davis with his knowledge and consent, but this started a train of consequences that resulted in the loss sought to be recovered in this litigation.

On September 18, 1929, Garrett purchased 100 shares of General Theatres in the name of Davis, but without his knowledge, and sold it an hour later the same day and made a profit of $223.50. However, after the stock had been bought and sold, but before the transaction was entered in the books, Garrett telephoned to Davis and asked permission to run the deal through his account. Davis complained that this would increase his income taxes. Garrett then suggested opening a No. 2 account through which to run the General Theatres account and agreed to pay the income tax on that account. Davis consented, and, when the check for the profit was given him, he indorsed it to Garrett.

The evidence does not indicate that Davis intended that other purchases and sales were to be put through account No. 2, but on the following day, without the knowledge of Davis, Garrett again bought 100 shares of General Theatres and sold it at a profit of $123.-50. This transaction he put through account No. 2, but left the profit in the account. Subsequently Garrett bought 100 shares of Commonwealth & Southern. After the purchase, but before the record thereof had been entered in the ledger, he telephoned Davis, told him of the purchase, and asked permission to run it through the account. Davis consented, and told him to leave it in the account overnight. The market was down the following day, and the stock remained in the account until the end of the week, when Garrett sold the stock at the request of Davis at a profit of $40. This left a profit in the account of $163.50 at this time.

During the balance of September and the whole month of October, Garrett, without authority, consent, or knowledge of Davis, made many purchases and sales in the name of Davis, and ran them through account No. 2, and,

as a result, the account, at the beginning of November, showed a net loss of $13,234.43.

Garrett directed the stenographer in the office of the plaintiffs to give him all the notices and confirmations belonging to Davis, and said that he would deliver them personally. He delivered those relating to accounts Nos. 1 and 3, which Davis carried with the firm, but destroyed those relating to account No. 2, in order to conceal from Davis his unauthorized transactions. For the same purpose he took the margin cards of that account out of the regular rack provided for them and hid them in his desk.

Davis does not appear to have known of any of these transactions, except those of the General Theatres and the Commonwealth & Southern, until November 3, 1929, when an audit was made of the firm's books, and the auditors reported to Mr. Chandor, the manager, that they could not find the margin cards of the No. 2 account of Davis. Garrett denied that he had anything to do with that account. However, he ran away to New York, but returned in a day or two, and confessed that he had made these purchases and sales without any order from Davis and without margin or collateral, other than the securities which he had thus purchased.

The casualty company was notified, but disclaimed any liability, and, after certain litigation, not here material, which determined the liability of the brokerage firm to Davis, suit was brought by the plaintiffs in common pleas court No. 1 of Philadelphia county against the casualty company, and that company removed the cause into the federal court and issued a scire facias under the Pennsylvania statute of April 10, 1929, P. L. 479 (12 PS § 141), to bring Davis upon the record as additional defendant on the ground that he was liable for any loss which the casualty company might sustain under the policy.

The case was tried to the court and jury, and a verdict was rendered by the jury for the plaintiffs in the sum of $14,328.63. A verdict was also rendered in favor of Davis in the scire facias proceedings.

Appeals were taken to this court, and the appellant says that the judgments should be reversed on the ground that the evidence warranted a finding that Garrett's conduct was not fraudulent within the meaning of the policy of indemnity, that Davis was liable to it, and that plaintiffs had breached the conditions of the policy.

■ The casualty company relied on the three transactions of which Davis had knowledge

to establish that Garrett's conduct was not fraudulent. These transactions related to the purchase of 100 shares of Horn & Hardart, the purchase of 100 shares of General Theatres on September 18, 1929,. and 100 shares of the same stock on September 19, 1929. Of these, Davis suggested the first, ratified the second, and condoned the third. In all of these, a profit was made. There is absolutely no evidence, however, that he authorized, consented to, or had knowledge of any of the other transactions which resulted in the loss of $13,234.43· until the discovery was made by the auditors. All the evidence is to the contrary. There is no dispute of fact as to the three transactions of which Davis had knowledge either before or after they occurred. There is no evidence which will sustain the theory of the defendant that Garrett had the "implied consent" of Davis to engage in these fraudulent transactions. In discussing this subject, the learned trial judge said: "Now with respect to the claim that the surety company is making against Davis, where the burden is on them to show that this account was a genuine Davis account, for which he was responsible, so far as the surety company case against Davis is concerned, I charge you that there is no evidence in this case from which you could find that that was a genuine account of Davis. So that; in that feature of the case, I direct you as matter of law, that your verdict shall be in favor of Davis, the so-called additional defendant in this case."

This charge was in accordance with both the facts and the law in the case, and disposes of the first and second contentions of the appellant. Garrett's conduct came clearly within the terms of the policy against which the casualty company agreed to indemnify the plaintiffs.

▮ Defendant further says that the judgment should be reversed because the plaintiffs breached the bond they are seeking to enforce.

The bond of indemnity provides that it does not cover:

"E—Any indebtedness or balance due the Insured on any customer's account, whether the account of an actual bona fide customer or a fictitious account; without prejudice, however, to the rights of the Insured with respect to any loss sustained through trades fraudulently conducted by an Employee in the name of a genuine customer; provided the Insured shall comply with the following conditions, namely:

"1.—Shall put in effect a rule that the bookkeeper or the bookkeeping department shall each day send to each and every customer a memorandum of all trades made for his account, and at the end of each calendar month, send to each and every customer a detailed statement showing the status of his account, the securities on hand and the balance due; and the partners shall exercise reasonable supervision to see that such rules are followed."

This bond, therefore, did not cover any loss in Davis' account sustained through fraudulent trades of Garrett, unless the plaintiffs put in effect a rule that the bookkeeper or the bookkeeping department should each day send to each and every customer a memorandum of all trades made for his account, and, at the end of each calendar month, send to each and every customer a detailed statement showing the status of his account, etc. The inquiry is twofold: (1) Was the loss sustained through fraudulent trades of Garrett? and (2) Did the plaintiffs put in effect the rule mentioned in the bond?

The evidence tends to show, and the verdict establishes, that the loss was sustained through the fraudulent trades of Garrett. The evidence also shows that a rule was put in effect that the bookkeeper or the bookkeeping department should each day send to each customer the trades made in his account and at the end of each month a detailed statement showing the status of his account. The bond required that the plaintiffs put in effect a rule that these statements be sent. That meant by mail or otherwise. The evidence shows that at least 90 per cent. of them were mailed and others were given personally by the bookkeeper to some member of the firm.

The evidence does not show whether these statements which were given by the bookkeeper to members of the firm were mailed by them to the customers or delivered personally. But the evidence does show the existence of the rule, and there is no competent evidence that shows that the partners did not "send" or deliver the statements to the customers. No one has complained that he did not receive them, or that the partners did not exercise reasonable supervision to see that the rule was followed. The establishment of the rule and reasonable supervision to see that it was followed are all that the bond required. The burden was on the defendant to show that the bond was breached, in that the rule was not put in effect and that reasonable supervision was not exercised to see that it was followed. This burden it did not bear. That Garrett concealed the notices, confirmations, and margin cards of account No. 2 is relied on by the appellant to establish that plaintiffs breached

the bond, but his conduct in these matters does not prove the breach. It rather indicates the existence of the rule and its general observance.

The trial was without error, and the judgments in favor of Richard Hano et al. and Gilbert C. Davis are affirmed.