**HARRISS et al. v. INDEMNITY INS. CO. OF NORTH AMERICA et al. \***

No. 46.

Circuit Court of Appeals, Second Circuit.

Dec. 13, 1937.

---

\*Writ of certiorari denied 58 S.Ct. 646, 82 L.Ed. ——.

AUGUSTUS N. HAND, Circuit Judge, dissenting in part.

———◆———

Warner Pyne, Jacob Scholer, and Milton Kunen, all of New York City, for plaintiffs.

James I. Cuff, of New York City, for defendant Indemnity Insurance Company of North America.

William J. McArthur, of New York City, for defendant United States Fidelity & Guaranty Co.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

SWAN, Circuit Judge.

The plaintiffs are a firm of stockbrokers. Their action sought recovery of $100,000 from each of the defendants upon a "brokers' blanket bond," insuring in an amount of $200,000 against losses sustained through the dishonesty of employees. Jurisdiction of the District Court rested upon diversity of citizenship. The case was tried to the court and a jury of one. At the conclusion of the trial each side moved for a directed verdict. The court directed a verdict against each defendant for $13,224, with interest and costs. From the judgment entered thereon, both parties have appealed. The questions presented are whether all or any of the losses sustained by the plaintiffs through acts of their employee Welker Cochran are within the coverage of the bond.

Cochran was in the employ of the plaintiffs as a customers' man from March 17 to May 30, 1930. During this period he brought to the plaintiffs twenty-two margin

accounts which dealt almost exclusively in stock of Manhattan Electrical Supply Company. This stock was quoted on the New York Stock Exchange, but the market price was being "rigged" by the operation of a fraudulent pool conducted by men with whom Cochran was in collusion. He knew that the plaintiffs would not have accepted the accounts had they been aware of the pool, and he did not disclose to them its existence. When the pool withdrew support, the market price of the stock fell so fast that the plaintiffs could not close out the margin accounts in time to avoid loss. After they were closed out, the debit balances of customers on these twenty-two accounts aggregated $300,612.49. For the loss thus incurred the plaintiffs filed proof of loss as required by the bond, and then brought this action to recover the full amount of the insurance. The twenty-two accounts fall into three groups: (1) Eighteen accounts belonged to customers who had no knowledge of the pool; (2) two accounts, those of Ross and Christian, were operated for the pool; (3) two accounts were operated by Cochran for his own benefit in the names and with the consent of two friends, Ferguson and Bowles. It was contrary to the rules of the exchange for a customers' man to trade for his own account and contrary to the plaintiffs' instructions to Cochran. For the loss sustained in the accounts carried by Cochran in the names of Ferguson and Bowles the plaintiffs were awarded judgment; losses sustained on the other accounts were held not to be within the coverage of the bond. The material provisions of the bond read as follows:

"In consideration of the premium * * * the Underwriter hereby undertakes and agrees to indemnify the Insured and hold it harmless from and against any loss, to an amount not exceeding Two Hundred Thousand Dollars ($200,000.) of money [and other specified kinds of property] * * * sustained by the Insured. * * *

"(A) Through any dishonest act of any of the Employes, wherever committed, and whether committed directly or by collusion with others.

"(B) Through larceny * * * while the Property is within [specified locations]. * * *

"(C) Through robbery * * * while the Property is in transit. * * *

"The foregoing agreement is subject to the following conditions and limitations: * * *

"2. This bond does not cover—

"* * * (d) Any loss the result of any loan made by the Insured or by any of the Employes, whether authorized or unauthorized, unless such loan be made with intent on the part of such Employes to defraud the Insured.

"(e) Any indebtedness or balance due the Insured on any customer's account, whether the account of an actual bona fide customer or a fictitious account; without prejudice, however, to the rights of the Insured with respect to any loss sustained through trades fraudulently conducted by an Employe in the name of a genuine customer: Provided the Insured shall comply with the following conditions, namely:

"(1) Shall put in effect a rule that the bookkeeper or the bookkeeping department shall each day send to each and every customer a memorandum of all trades made for his account, and at the end of each calendar month, send to each and every customer a detailed statement showing the status of his account, the securities on hand and the balance due; and the partners shall exercise reasonable supervision to see that such rules are followed.

"(2) Shall at least once in each month cause all securities which the books and records show to be in the custody of the Insured, those belonging to the customers as well as those belonging to the Insured, to be actually counted and verified by the Insured."

Whether the plaintiffs' losses were within the coverage of the insurance involves construction of the foregoing provisions, and particularly the exceptions from liability expressed in clauses 2 (d) and (e). The losses represented debit balances on customers' accounts; hence we turn first to clause (e), which deals specifically with such losses.

Clause (e) starts by excluding from the coverage "any balance due on any customer's account, whether the account of an actual bona fide customer or a fictitious account." This, however, is immediately followed by the "without prejudice" provision which creates an exception to exclusion from coverage whenever a loss is "sustained through trades fraudulently conducted by an employee in the

name of a genuine customer," provided the insured shall have complied with the stated conditions respecting sending to the customer a memorandum of all trades for his account, and verifying his securities monthly. Cochran "conducted" no "trades" for any of the twenty accounts in the first and second groups above mentioned; all trades were conducted by other employees at the request of the customers. It would stretch beyond all reason the meaning of the words to hold that Cochran "conducted trades" merely because he brought the customers to the brokers' office and advised them to buy the stock for which they placed orders. With respect to the Ross and Christian accounts, constituting group (2), it is urged that, since these were accounts for the pool, the customer's orders may be attributed to Cochran as a fellow conspirator. When it is sought to impose civil or criminal responsibility upon fellow conspirators, it is true that one may be charged with the acts of another; but we are concerned with the liability of insurers under this policy. They did not insure against losses on trades conducted by Ross or Christian, for they were not employees of the plaintiffs. If their acts were attributed to Cochran, the trades they ordered would still be trades conducted by a nonemployee, and not within the coverage of the policy. With respect to the two accounts in group (3), those which Cochran conducted for himself in the names of Ferguson and Bowles, the question of liability turns on whether the adverb "fraudulently" covers more than a fraud upon "a genuine customer," and this in turn depends upon whether the two provisos to 2(e) should be read as applying to the whole, or to only a part, of the risk accepted by the insurers. We think the inference is clear that it was intended to cover the whole risk; that is to say, that liability was accepted only with respect to accounts where the two provisos would be a check and control on the extent of liability. Such a construction would not preclude liability in such a situation as was involved in Continental Casualty Co. v. Hano, 58 F.2d 62, 64 (C.C. A. 3). In the case of a genuine customer who allows his name to be used by an employee, the prescribed checks would be no protection. To say that clause 2(e) may cover cases where the protection system required of the insured would not be a check seems to us to disregard the pur-

pose of the provisos. The risk assumed was a conditional risk; the condition was to give the underwriter protection coextensive with the risk; to extend it further we should do more than to resolve an ambiguous clause against the underwriter. The conclusion that the risk is limited to trades fraudulent as against the customer gains further support from an analysis of how the broker's loss will occur. If the broker's employee conducts a trade in the name of a genuine customer but without his authority, the loss will result from the broker's inability to charge the customer with an unauthorized transaction. But, if a trade is conducted in the name of a genuine customer with his consent (i. e., it is a trade not fraudulent as against him), the broker may charge his account with it, and loss will occur only if the customer is financially irresponsible. It cannot be supposed that the policy was intended to insure a loss due to the insolvency of a genuine customer; indeed, the first sentence of clause (e) even excludes loss on a fictitious account. Hence we conclude that no liability was proven under the coverage of 2(e).

The plaintiffs argue also that their losses were within the coverage of clause 2(d) because they resulted from loans made by them with the intent on the part of Cochran to defraud them. We agree with their contention that, when a broker buys stock for a customer's margin account, he lends to the customer the difference between the purchase price and the customer's margin deposit. The daily debit balance of the customer's account evidences the amount of such loan. But loss resulting from any loan made by the insured or any of the employees, whether with or without authority, is excluded from the coverage, unless "such loan" be made with fraudulent intent on the part of "such employees." We read this as meaning that the employee making the loan must have the intent to defraud the insured. Cochran had nothing to do with making loans to margin customers. With respect to the accounts in the names of Bowles and Ferguson, he might be held to have been the borrower under the doctrine of undisclosed principal. Hence we do not think any liability was established under clause 2(d), even if it be construed to include loans made to margin customers. In our opinion, however, it does not refer to loans

represented by the debit balances of customers' accounts. Since 2(e) relates expressly to the debit balance of any customer's account, 2(d) must be restricted to other loans in order that both clauses may consistently stand together. If the loans mentioned in 2(d) be read to include loans to margin customers, a customer's debit balance would be insured even though the brokers had not put into effect the system of protection required by the provisos to 2(e). This was certainly not intended. Nor does the suggested restriction of 2(d) deprive the clause of adequate scope. There are other loans not affecting the debit balance of a customer's account, which an employee might make with intent to defraud the insured; for example, he might lend securities belonging to the insured—to mention only one illustration.

The conclusion is that neither under clause (d) or clause (e) was any liability established. Consequently, the judgment must be affirmed on the plaintiffs' appeal and reversed on the defendants' appeal. So ordered.

AUGUSTUS N. HAND, Circuit Judge (dissenting in part).

I agree with the court below that the defendants are liable under subdivision 2 (e) of the bond of indemnity for the losses arising under the Bowles and Ferguson accounts conducted by Cochran for himself with their permission and in their names. The prevailing opinion holds that liability under 2(e), supra, only extends to losses caused by frauds of employees upon genuine customers and does not extend to frauds upon the insured perpetrated by means of trades conducted by employees in the names of such customers. Certainly it does cover the latter trades unless the provisos under 2(e) and 1 and 2 with regard to notice and verification limit liability to situations where the customers are defrauded. It is true that the provisions for notice and verification would afford little protection to customers who were not themselves operating. Yet this would not invariably be true, for customers who allowed Cochran to operate in their names, but for his own benefit, would be warned by the notices of the state of the accounts he conducted, and because of the warning would have a chance to have the accounts closed out and to prevent their losses from becoming any greater. Primarily the bonds were to indemnify the insured against losses to them. The insured had no direct concern as to whether the losses they suffered affected their customers or not. Subdivision 2 (e) literally covers losses to the insured through trades conducted by an employee in the name of a genuine customer and requires notice to that customer as a safeguard and such a notice was given here. I think the bond ought to be construed as covering the cases it literally describes, even though in some instances the notices would afford little or no protection to the insurer. If the indemnity furnished the insured under 2(e) was intended to extend only to losses sustained "through trades fraudulently conducted by an employee in the name of a genuine customer" without the knowledge of the customer, it would have been easy to insert such a limitation in the bond. In the absence of such a limitation, the bond written by the insurance company ought to be broadly construed and, if thus construed, the judgment below should be affirmed.